■ WYLE INC. et al., Respondents, v ITT CORPORATION et al., Appellants. [13 NYS3d 375]—

Order, Supreme Court, New York County (Charles E. Ramos, J.), entered October 23, 2013, which denied defendants' CPLR 3211 (a) (1) and (7) motion to dismiss plaintiffs' amended complaint asserting fraudulent inducement, affirmed, without costs.

The court properly concluded that the fraudulent inducement claim was not duplicative of the breach of contract claim.

The underlying facts of this case are adequately set forth in the dissent and need not be repeated here. Moreover, we have little disagreement with our dissenting colleague's review of the two lines of cases addressing the issue of whether a fraudulent inducement claim alleged in a complaint is duplicative of a breach of contract claim. Where we differ is in the application of those precedents to the facts before us.

It is axiomatic that in order to state a claim for fraudulent inducement, "there must be a knowing misrepresentation of

material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury" (*GoSmile, Inc. v Levine*, 81 AD3d 77, 81 [1st Dept 2010], *lv dismissed* 17 NY3d 782 [2011]). In the context of a contract case, the pleadings must allege misrepresentations of present fact, not merely misrepresentations of future intent to perform under the contract, in order to present a viable claim that is not duplicative of a breach of contract claim (*id.*). Moreover, these misrepresentations of present fact must be "collateral to the contract and [must have] induced the allegedly defrauded party to enter into the contract" (*Orix Credit Alliance v Hable Co.*, 256 AD2d 114, 115 [1st Dept 1998]). Therefore, "[a]s a general rule, to recover damages for tort in a contract matter, it is necessary that the plaintiff plead and prove a breach of duty distinct from, or in addition to, the breach of contract" (*Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 118 [1st Dept 1998] [internal quotation marks omitted]).

Here, defendants on appeal concede that the intentional failure to disclose an ongoing audit is a misrepresentation as to a present fact. They argue, however, that, since the nondisclosure is a breach of a contractual warranty contained in a specific provision of the contract itself, the misrepresentation is not collateral to the contract, thus making plaintiff's fraudulent inducement claim duplicative of its breach of contract claim. Plaintiffs, on the other hand, contend that misrepresentation of a contractual warranty may form the basis of a separate fraudulent inducement claim, particularly where, as here, the misrepresentation concerns the core value of a business or asset in the contract. Both parties cite precedent in support of their positions. Therefore we must, as did the dissent, examine the two lines of cases cited to determine where this case falls.

We agree with the dissent that in order to sustain the fraud cause of action, there must be a breach of a duty separate from or in addition to the contract duty (*see e.g. J.E. Morgan Knitting Mills v Reeves Bros.*, 243 AD2d 422 [1st Dept 1997]). Unlike the dissent, however, we find the cases cited by defendants turn on facts that distinguish them from the present case.

For example, in *ESBE Holdings, Inc. v Vanquish Acquisition Partners, LLC* (50 AD3d 397 [1st Dept 2008]), we held that the fraud causes of action were duplicative of the contract causes of action because they arose from the written provisions of the several agreements entered into by the parties (*id.* at 398). Significantly, however, we also found that the misrepresentations were not extraneous to those agreements because "none of [the] misrepresentations caused the actual investment

losses" (50 AD3d at 399). Here, the failure to disclose the General Services Administration audit as required by the contract directly resulted in the losses claimed. As discussed in further detail herein, a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim (*Jo Ann Homes at Bellmore v Dworetz*, 25 NY2d 112, 120-121 [1969]).

Similarly, in *RGH Liquidating Trust v Deloitte & Touche LLP* (47 AD3d 516 [1st Dept 2008], *lv dismissed* 11 NY3d 804 [2008]), we found that the fraud claims were duplicative of the breach of contract claim because they were based on alleged fraudulent misrepresentations related to the defendants' obligation under the agreement to conduct audits of financial statements with reasonable care. However, this is not the factual case before us. The representation in *RGH* involved future performance, i.e., the duty to conduct reliable audits, which was, we found, "in essence a claim of professional malpractice" (47 AD3d at 517). The misrepresentation was thus not one of present fact, as we concededly have in this case, but one of future intent, and the cause of action for fraud in *RGH* was thus properly dismissed.

The second line of cases on this issue hews closer to the facts before us.

In *First Bank of Ams. v Motor Car Funding* (257 AD2d 287 [1st Dept 1999]), the plaintiff bought used car loans from defendant Motor Car Funding (MCF). The agreement contained warranties that the loans would comply with certain underwriting guidelines. MCF allegedly misrepresented the quality of the loans, inducing First Bank to purchase less valuable loans, which ultimately resulted in losses to the plaintiff. We sustained the fraud claim, finding that the allegations that the defendants misrepresented certain facts about the loans "cannot be characterized merely as an insincere promise of future performance" (*id.* at 292). We went on to hold that "a cause of action for fraud may be maintained where a plaintiff pleads a breach of duty separate from, or in addition to, a breach of the contract (*Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 118). For example, if a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to the plaintiff's breach of contract claim . . . Unlike a misrepresentation of future intent to perform, a *misrepresentation of present facts is collateral to the contract* (though it may have induced the plaintiff to sign the contract) and therefore involves a separate

breach of duty (*Deerfield Communications Corp. v Chesebrough-Ponds, Inc.*, 68 NY2d 954, 956 [(1986)])...

"Nor is the fraud claim rendered redundant by the fact that these alleged misrepresentations breached the warranties made by MCF in the Agreement... The core of plaintiff's claim is that defendants intentionally misrepresented material facts about various individual loans so that they would appear to satisfy these warranties... This is fraud, not breach of contract. *A warranty is not a promise of performance, but a statement of present fact.* Accordingly, a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim (*see, Jo Ann Homes at Bellmore v Dworetz*, 25 NY2d 112, 120-121)" (257 AD2d at 291-292 [emphasis added]).

Similarly, in another case involving false representations involving present contract warranties as to the quality of certain loans which were relied on by an insurer of those loans in its decision to insure those loans, we held that "[a] fraud claim will be upheld when a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, even though the same circumstances also give rise to the plaintiff's breach of contract claim" (*MBIA Ins. Corp. v Countrywide Home Loans, Inc.*, 87 AD3d 287, 293 [1st Dept 2011], citing *First Bank*). In reaching our conclusion, we noted that the allegations in the complaint must, on a CPLR 3211 motion (like the one presently before us), be accepted as true. That being the case, we went on to hold that "[b]ecause MBIA alleges misrepresentations of present facts, and not future intent, made with the intent to induce MBIA to insure the securitizations, the fraud claim survives. It is of no consequence that some of the allegedly false representations are also contained in the agreements as warranties and form a basis of the breach of contract claim" (87 AD3d at 294 [citations omitted]). Such a rule makes sense, for, as we noted in *MBIA*, " '[i]t simply cannot be the case that any statement, no matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract' " (*id.,* quoting *In re CINAR Corp. Sec. Litig.*, 186 F Supp 2d 279, 303 [ED NY 2002]).

Although the dissent contends that the false representations in *First Bank* and *MBIA* were separate from the warranties contained in the contract, those representations were in fact warranted to be accurate at the time the contract was entered into and made for the purposes of inducing the plaintiffs to

purchase those loans. They were designed to be relied on to arrive at an accurate value of the loans, and the value of the company being purchased here. These misrepresentations did not merely evince "an insincere promise of future performance [but were] instead . . . misrepresentation[s] of then present fact[s] that [were] collateral to the contract, and thus plaintiff sufficiently alleged a cause of action sounding in fraud" (*Go-Smile, Inc. v Levine*, 81 AD3d at 81; *see also Merrill Lynch & Co. Inc. v Allegheny Energy, Inc.*, 500 F3d 171, 184 [2d Cir 2007]; *RKB Enters. v Ernst & Young*, 182 AD2d 971, 972 [3d Dept 1992]). To hold otherwise would be a far too restrictive application of our precedents. Concur—Mazzarelli, J.P., Sweeny, DeGrasse and Manzanet-Daniels, JJ.

Moskowitz, J., dissents in a memorandum as follows: The issue presented in this case is far less clear cut than the majority memorandum would suggest. In fact, when considering whether a misrepresentation of a contractual warranty can sufficiently support a separate cause of action for fraud, or whether the allegation of a fraudulent misrepresentation merely duplicates a claim for breach of contract, this Court has reached different results depending on the specific facts presented. Because I believe that under the applicable line of cases, the misrepresentation here supports a claim for breach of contract but not a separate claim for fraud, I respectfully dissent.

This action arises from alleged misrepresentations by defendant ITT Corporation in connection with its sale of nonparty CAS, Inc. to plaintiffs Wyle Inc. and Wyle Services Corporation (collectively, Wyle). According to the allegations in the complaint, ITT acquired CAS's parent company, nonparty EDO Corporation, but planned to sell CAS, as CAS was not profitable for ITT's business.[1]

CAS, a defense contractor, provided engineering, scientific, and technical services to the federal government, and earned most of its revenue through defense contracts with the government. Payment for CAS's work under its contracts with the federal government was governed by a Professional Engineering Services schedule (PES schedule), which CAS negotiated with the government's General Services Administration (GSA). A PES schedule set forth the basic terms and conditions, including pricing and rate ceilings, by which the federal government

---

1. Defendants Exelis Inc. and Xylem Inc. are successor entities to defendant ITT; nonparty EDO, CAS's parent company, was a predecessor entity to Exelis. For ease of reference, all defendants are referred to collectively as "ITT."

was permitted to buy commercial products and services from companies holding the PES schedule. PES schedules generally had a defined period of performance, and gave the GSA the option to extend the period. Further, the GSA had the right to audit the PES schedules and adjust the rates set forth in them. Although contracting officers from the GSA usually performed the audits, the GSA's Office of Inspector General (OIG) would occasionally become involved. Audits by the OIG typically resulted in rate reductions, and therefore negatively affected the profitability of a contractor's business.

Plaintiff alleges that in early 2010, the GSA notified CAS that it intended to extend one of CAS's PES schedules, which provided the labor rates for CAS's largest contract with the government. The GSA requested that CAS submit new proposed rates, and CAS did so. On March 1, 2010, the OIG sent CAS a letter apprising CAS that the government had chosen CAS's PES schedule for a "pre-award" audit.

During the OIG audit, Wyle decided to buy CAS. The terms of the sale were memorialized in a Stock Purchase Agreement (SPA), dated August 7, 2010, under which Wyle agreed to pay EDO $235 million to acquire all of CAS's capital stock. Before agreeing to pay the purchase price, however, Wyle insisted that EDO agree to a series of representations allegedly designed to ensure that the potential risks associated with CAS's government contracts were disclosed. According to Wyle, these representations were important because anything that could negatively affect CAS would impair the value of the company.

Thus, Wyle alleged in the complaint, Wyle required EDO to disclose all audits that were ongoing when the parties entered into the contract. Specifically, article III of the SPA governs "Representations and Warranties of the Seller [i.e., EDO] and the Company [i.e., CAS]." The SPA required EDO and CAS to make certain representations and warranties, including a representation that CAS would disclose whether any of its contracts were under audit as of the date of the SPA. To that end, the SPA stated: "Section 3.15 (c) (v) of the [accompanying] Company Disclosure Schedule lists each Government Contract or Government Bid to which the Company is a party which, to the Company's knowledge, is as of the date hereof under audit by any Governmental Authority or any other Person that is a party to such Government Contract or Government Bid." EDO, however, allegedly failed to disclose OIG's ongoing audit.

Ultimately, the sale transaction closed on September 8, 2010, without disclosure of the OIG audit. Six months later, on March 4, 2011, GSA announced the results of OIG's audit; the audit

resulted in rates lower than CAS had submitted for the new PES schedule and a rate reduction under the then-current PES schedule, which was not due to expire until April 2011. CAS signed the new schedule on March 23, 2011.

In December 2011, after unsuccessful demands for contractual indemnification of the loses arising from EDO's breach of section 3.15 (c) (v) of the SPA, Wyle commenced this action, asserting a breach of contract claim for breaching the warranty that required disclosure of the OIG audit, and for refusing to indemnify Wyle for losses caused by that breach. Wyle argued that had it known about the OIG audit, it would have paid less for CAS. By order entered November 14, 2012, the court granted ITT's motion to dismiss the complaint, concluding that Wyle failed to comply with the notice requirements of the indemnification clause.

Pending an appeal from that order, Wyle amended its complaint to add a second cause of action for fraudulent inducement, the subject of this appeal. In the amended complaint, Wyle alleged that ITT had misrepresented in the SPA that all ongoing audits of every CAS government contract had been disclosed and that, relying on that misrepresentation, Wyle was induced to enter into the agreement and sustained damages in an amount more than $20 million. Wyle also sought punitive damages.

In April 2013, ITT moved to dismiss the amended complaint, arguing that the fraud claim was duplicative of the breach of contract claim because the alleged misrepresentation was a misrepresentation in the SPA itself, and was not collateral to the contract. In opposition, Wyle argued that the misrepresentation was one of present fact, and that the misrepresentation of present fact had induced it to enter into the contract. Wyle also pointed out that the notice requirements in the indemnification clause did not apply to situations of intentional misrepresentation or fraud. Further, Wyle argued, ITT had "superior knowledge" of the OIG audit and had made a partial, and thus misleading, disclosure.

In October 2013, the motion court denied ITT's motion to dismiss the fraud claim. The court concluded that ITT's misrepresentation of the existence of the OIG audit was one of present fact, and not one of future performance. The motion court also noted that a warranty was not a promise of performance, but one of present fact, and that a fraud claim can be based on a breach of contractual warranties. The court also found that Wyle had sufficiently pleaded justifiable reliance and damages.

By a decision dated February 18, 2014, this Court reversed the motion court's November 2012 order and reinstated the breach of contract claim, finding that the indemnification clause applied (114 AD3d 505 [1st Dept 2014]). In so doing, we found that Wyle had stated a claim because the indemnification clause "excuses late notice by providing that 'no limitation or condition of liability provided for in this Article VIII shall apply in the event of . . . intentional misrepresentation'" (*id.* at 507).[2] We further noted that ITT had "deliberately kept Wyle from learning about the audit before the sale, which constitutes intentional misrepresentation" (*id.*).

ITT concedes that its alleged misrepresentation—namely, its failure to disclose existence of the OIG audit—was one of present fact. The parties, however, dispute whether the misrepresentation was collateral to the SPA, or rather, whether it was part of the SPA itself. ITT argues that without allegation of a misrepresentation collateral and extraneous to the contract, the claim was essentially a breach of contract claim, and the motion court should have dismissed it. ITT also asserts that Wyle sought the same measure of damages for both its breach of contract and fraud claims.

For its part, Wyle points to case law holding that misrepresentation of a contractual warranty constitutes a misrepresentation collateral to the contract. Wyle also asserts that the SPA itself contemplates a separate claim for fraud based on any intentional misrepresentation in the SPA, as the indemnification clause provides that the contractual damages and indemnification limitations do not apply "in the event of fraud or intentional misrepresentation." Finally, Wyle notes that the damages it seeks on the fraud claim are different from damages sought from the breach of contract claim, as it also seeks punitive damages.

To state a claim for fraudulent inducement, a plaintiff must allege "a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury" (*GoSmile, Inc. v Levine*, 81 AD3d 77, 81 [1st Dept 2010], *lv dismissed* 17 NY3d 782 [2011]; *see also Lama Holding Co. v Smith Barney*, 88 NY2d 413, 421 [1996]). A viable claim for fraud concerning a contract must allege misrepresentations of present fact (as opposed to future intent) that were collateral to the contract and that induced the allegedly defrauded party to enter into the contract

---

**2.** The indemnification clause states in full: "no limitation or condition of liability provided for in this Article VIII shall apply in the event of fraud or intentional misrepresentation."

(*Sabo v Delman*, 3 NY2d 155, 160 [1957]; *Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 118 [1st Dept 1998]).

This Court has produced two lines of cases addressing breach of contract claims vis-à-vis fraud claims. One line of cases holds that a fraud claim is duplicative of a breach of contract claim where the fraud claim arises wholly from the written provisions of an agreement. For example, in *J.E. Morgan Knitting Mills v Reeves Bros.* (243 AD2d 422 [1st Dept 1997]), we held that the cause of action for fraud, alleging that the defendants had deliberately given false warranties that there were no undisclosed liabilities burdening the property, was properly dismissed as duplicative of the plaintiffs' cause of action for breach of contract. In so holding, we noted that the fraud alleged was based on the same facts as those that underlay the contract claim, and thus, were "not collateral to the contract," and that plaintiff had alleged "no damages . . . that would not be recoverable under a contract measure of damages" (*id.* at 423; *see also Varo, Inc. v Alvis PLC*, 261 AD2d 262, 265 [1st Dept 1999], *lv denied* 95 NY2d 767 [2000]).

Likewise, in *ESBE Holdings, Inc. v Vanquish Acquisition Partners, LLC* (50 AD3d 397 [1st Dept 2008]), we dismissed a fraud claim as duplicative of a breach of contract claim, as the fraud claim "arose directly from the written provisions" of the agreements; thus, the only misrepresentations appeared in the contract itself (*id.* at 398). Moreover, we held, there was no merit to the plaintiffs' contention that many of the alleged misrepresentations were extraneous to the contract, as none of the misrepresentations caused the actual investment losses (*id.* at 399).

We took a similar view in *RGH Liquidating Trust v Deloitte & Touche LLP* (47 AD3d 516 [1st Dept 2008], *lv dismissed* 11 NY3d 804 [2008]), where we found that the motion court had properly dismissed the plaintiff's fraud claims as duplicative of the breach of contract claim. In so doing, we found that the fraud claims were based on allegedly fraudulent misrepresentations regarding the defendants' obligation under their agreements with the debtors to conduct audits of financial statements with reasonable care, but alleged no misrepresentations collateral or extraneous to the agreements (*see also Orix Credit Alliance v Hable Co.*, 256 AD2d 114, 115 [1st Dept 1998] [in dismissing fraud counterclaim, noting that the defendant was seeking nothing more than contract damages, and "far from being collateral to the contract, the purported misrepresentation was directly related to a specific provision of the contract" (internal quotation marks omitted)]).

On the other hand, another line of cases has applied the principle that a fraud claim can be maintained even where it is based on conduct that has some relation to the facts of a breach of contract claim. However, in that line of cases, courts have been obliged to look outside the contracts to determine whether the defendant had made an actionable misrepresentation. Stated another way, in cases where the plaintiffs were permitted to advance a separate fraud cause of action, the misrepresentations concerned matters outside the text of the parties' contracts.

For example, in *First Bank of Ams. v Motor Car Funding* (257 AD2d 287 [1st Dept 1999]), which the motion court cited, the plaintiff alleged in the complaint that it had bought car loans from the named defendant. The contract between the parties in *First Bank* gave the plaintiff a right to purchase certain loans over a period of time. In the contract, the defendant warranted that the loans would conform to certain underwriting guidelines. The allegedly false representations, however, concerned collateral for the loans; the plaintiff alleged that the defendants made the false representations after the parties had signed the contract, when the defendant sold the loans to the plaintiff (*id.* at 292).

Thus, in *First Bank,* the fraud claim was based upon representations entirely separate from the ones in the contract. Here, in contrast to the situation in *First Bank*, the duty to disclose the audit arose solely from the terms of the parties' agreement. Therefore, the fraud cause of action here presents no duty separate from, or in addition to, the one created by the contract documents. On the contrary, the second cause of action is based on a duty having its only origin in the SPA; according to the SPA, ITT promised to inform Wyle of any ongoing audits, yet it did not so do. Thus, this case differs from *First Bank* in that Wyle alleges no misrepresentation outside the scope of the contract.

Similarly, in *MBIA Ins. Corp. v Countrywide Home Loans, Inc.* (87 AD3d 287 [1st Dept 2011]), the relevant misrepresentations were extraneous to the contract itself. In *MBIA*, the plaintiff entered into multiple insurance contracts with the defendants, agreeing to provide financial guarantee insurance for certain mortgage-backed securities that the defendant had sold to investors. After the defendants were unable to meet their payment obligations on those securities, the plaintiff was forced to pay out on its insurance policies. In its action against the defendants, the plaintiff alleged, among other things, that the defendant made material representations concerning the qual-

ity of the mortgage loans underlying the securitizations, and breached warranties in the contracts concerning the quality of those loans. For example, the plaintiff alleged that the defendant had abandoned its underwriting guidelines by knowingly lending to borrowers who could not afford to repay the loans (*id.* at 291-292). Similarly, the plaintiff alleged that the defendants had provided false or inflated ratings for the proposed pools of mortgage loans (*id.* at 292), and the plaintiff also alleged that one defendant had made misleading statements in its Form 10-K and prospectuses. Thus, as in *First Bank*, these alleged misrepresentations constituted matters of fact outside the actual language of the parties' contracts. As a result, the relevant misrepresentations became evident only upon looking to matters lying outside the terms of the contract, and thus went beyond mere contractual misrepresentations.

In sum, there is a difference between cases in which appellate courts have upheld fraud claims, on the one hand, and cases in which courts have dismissed claims as duplicative of a breach of contract claim, on the other. Specifically, in cases when we have sustained a fraud claim on a motion to dismiss in addition to the breach of contract claim, the fraud claim has been based upon facts outside the contract terms.

Here, as noted above, the fraudulent inducement claim arises from, and is directly related to, section 3.15 (c) (v) of the SPA, which governs representations and warranties. Indeed, Wyle alleges no more and no less that ITT breached its contractual duties as set forth in the representations and warranties of the SPA by failing to disclose the pre-award audit. This allegation does not state any noncontractual misrepresentation; rather, the misrepresentation made under the relevant contract provision also forms the basis for the breach of contract claim (*see Torchlight Loan Servs., LLC v Column Fin., Inc.*, 2012 WL 3065929, \*10, 2012 US Dist LEXIS 105895, \*25 [SD NY, July 25, 2012, No. 11 Civ 7426 (RWS)] ["it is not sufficient that the alleged misrepresentations are about then-present facts; rather, they also must be 'extraneous to the contract and involve a duty separate from or in addition to that imposed by the contract'" (quoting *Hawthorne Group v RRE Ventures*, 7 AD3d 320, 323 [1st Dept 2004])]).

The majority notes that the allegedly false representations in this case were warranted to be accurate when the parties entered into the contract, and that EDO made the representations for the purpose of inducing Wyle to purchase the loans. Thus, the majority concludes, EDO made "misrepresentation[s] of then present fact[s] that [were] collateral to the contract," thus sufficiently stating a cause of action sounding in fraud.

The majority's argument, however, misses the mark: the majority's characterization elides the fact that the contract language itself contains a specific reference to the disclosure schedule, which supposedly listed every government contract or bid under audit. The fraud claim rests upon Wyle's assertion that despite the clause in the SPA specifically stating otherwise, EDO knew that one of the contracts was, in fact, under audit. Thus, the alleged misrepresentation was specifically addressed by one of the contract terms, and the complaint contains no allegation that EDO made any misrepresentations other than the one specifically referring to the clause in the SPA. This situation therefore presents a claim for breach of contract, not fraud.

Our holding in *First Bank* does not contradict this position. In that case, the warranties in the purchase and sale agreement stated that certain loans to be offered to the plaintiff would comply with certain underwriting guidelines. The fraudulent representations in *First Bank* involved subject matter—namely, quality of collateral, credit history, and amount of down payments—extraneous to the contract warranties themselves (*see First Bank*, 257 AD2d at 292). Although we held that the alleged misrepresentations breached the general underwriting warranty in the underlying agreement, the alleged misrepresentations in *First Bank* also concerned matters that related to the individual loans but that were *not* specifically addressed in the general warranty (*see id.*). The facts in *First Bank* are therefore unlike the ones presented in the present case, where Wyle does not allege any misrepresentation other than the statement that the contracts were not under audit, and as noted above, the matter of audits was specifically and wholly contemplated by the SPA.

Thus, under the line of cases discussed above—namely, the line of cases beginning with *J.E. Morgan Knitting Mills*—I would hold that the motion court should have dismissed Wyle's fraud claim as duplicative of the breach of contract claim.

What is more, the measure of damages Wyle is seeking here—namely, the difference between the price it paid and the price that it would have paid had ITT disclosed the OIG audit—is the same for both the fraud and breach of contract claims. This fact also supports the conclusion that the fraud claim merely duplicates the breach of contract claim (*see e.g. Coppola v Applied Elec. Corp.*, 288 AD2d 41 [1st Dept 2001] [fraud claim not cognizable where the plaintiff did not allege any damages, including those for foregone opportunities, that would not be recoverable under a contract measure of dam-

ages]; *Varo, Inc.*, 261 AD2d at 265 [fraud claim duplicative of breach of contract claim where "no damages are alleged that would not be recoverable under a contract measure of damages" (internal quotation marks omitted)]).

There is also no merit to Wyle's assertion that because it seeks punitive damages on the fraud claim, that claim seeks damages different from those in the breach of contract claim. Indeed, it would make little sense to hold that merely asking for punitives necessarily creates a meaningful difference between a contract claim and a fraud claim; otherwise, a party could sustain a fraud claim merely by tacking on a request for punitive damages.