Daesang Corporation, Petitioner,

against
The Nutrasweet Company, NUTRASWEET IP HOLDINGS, INC., and SWEETENERS HOLDINGS KOREA LTD., Respondents.


655019/2016

For petitioner: John J. Janiec, Esq.
For respondent: Paul D. Sarkozi, Esq., of Tannenbaum Helpern Syracuse & Hirschtritt LLP


Charles E. Ramos, J.

Petitioner Daesang Corporation ("Daesang") petitions and moves to confirm the final arbitration award ("Final Award") entered by the International Chamber of Commerce ("ICC"), pursuant to CPLR 7510 and 7514(a), and 9 USC § 207.
Respondents, the NutraSweet Company, NutraSweet IP Holdings, Inc., and Sweeteners Holdings Korea LTD. ("NSCKorea") (collectively "NutraSweet") move, in sequence 01, to vacate the partial final award and the Final Award (together, Awards) of the ICC, pursuant to 9 USC §§ 10, 201 and 207, and CPLR 7511.
The motions are consolidated for disposition.
Background
The parties' dispute arises out of Daesang's sale of its aspartame business to NutraSweet. The parties entered into a series of agreements (the transaction), including a joint defense and confidentiality agreement ("JDA"), an asset purchase agreement ("APA"), and a processing agreement ("Processing Agreement").
NutraSweet possessed the contractual right to rescind the transaction within five years in the event that a customer purchasing a large volume of aspartame commenced an action alleging antitrust violations. This contractual right to rescission was set forth in section 10 of the JDA, and states:
"In the case of a Proceeding brought by...any customer with annual worldwide aspartame requirements in excess of [*2]1,000,000 pounds, a complaint has been filed against NutraSweet in court or in a similar administrative proceeding alleging that the Transaction was completed in violation of the antitrust laws...
(Sarkozi Aff., Ex. C, § 10).
The purchase price of the transaction was $79,250,000, which was to be paid by NutraSweet through a $5,000,000 payment at closing, with the balance paid in installments over a five-year period (Sarkozi Aff., Ex. A, p. 16). In the contractual documents, Daesang made a number of representations and warranties, including that it was in compliance with all applicable laws, and had the capacity to produce aspartame in accordance with strict contract specifications.
The parties agreed to arbitrate all disputes under the rules of the ICC (APA, § 10 [o], Pacella Aff., Ex. 4, § 10[o]; Processing Agreement, Article 17.2, Ex. 3A, ¶ 53). 
Three years after entering into the transaction, NutraSweet and Daesang were sued by a class of aspartame purchasers in the Eastern District of Pennsylvania for violation of federal antitrust laws, captioned In Re Aspartame Antitrust Litigation ("Antitrust Action") (Ex. D, annexed to the Sarkozi Aff.).
On March 20, 2007, NutraSweet notified Daesang that, pursuant to section 10 of the JDA, it was exercising its right to rescind the transaction based on the Antitrust Action, and sought the return of all payments made to Daesang (Ex. F, annexed to the Sarkozi Aff.). Daesang rejected NutraSweet's attempt to cancel the transaction, and instead, declared an event of default and purported to exercise its contractual right to accelerate the remaining purchase price obligations (Sarkozi Aff., Ex. A, p. 18).
On June 4, 2008, Daesang filed a request for arbitration with the ICC, asserting claims against NutraSweet for breaches of the APA and the Processing Agreement and seeking the balance of the purchase price installments (Ex. I, annexed to the Sarkozi Aff.). 
In its terms of reference and pleadings, NutraSweet asserted the following counterclaims and defenses: rescission based upon section 10 of the JDA; equitable rescission; fraud seeking recsissionary and consequential damages; breach of contract alleging that Daesang breached multiple provisions of the agreements, including sections 3, and 6 of the APA, and Articles 2.5, 2.10, 3.2, 4 and Exhibits 4.2 (a) and 4.2 [c] of the Processing Agreement pertaining to production capacity, quality of purchased inventory, product specifications, customer claims and complaints, the quality of raw materials, the covenant not to compete and confidentiality (Exs. I, N at ¶¶ 26, 30 annexed to the Sarkozi Aff.). In its breach of contract counterclaim, [*3]NutraSweet sought the return of $15 million already paid to Daesang and consequential damages in an amount greater than $8 million, or in the alternative, a set-off of the purchase price in an amount greater than $14,200,000 and consequential damages in an amount greater than $8 million (Ex. I at ¶ 26, annexed to the Sarkozi Aff.). NutraSweet also reserved its right to revise its summary of counterclaims as the case progressed (Id.).
On February 2, 2009, the parties stipulated to the jurisdiction of the ICC arbitral tribunal (the "Tribunal") to determine their disputes (Id., at ¶ 13).
The parties conducted discovery and made numerous written applications and submissions to the Tribunal, including pre and post hearing memoranda, pre hearing reply memorandum, and post-hearing summaries (Verified Petition, ¶ 14). In July 2011, the Tribunal held hearings in New York, where they heard and considered evidence, including witness statements and live testimony (Ex. B, M, N, O annexed to the Sarkozi Aff.).
In support of its counterclaim that Daesang fraudulently induced NutraSweet to enter into the transaction by misrepresenting its compliance with laws in the operation of its aspartame business, NutraSweet submitted an affidavit to the Tribunal (Ex. B, annexed to the Sarkozi Aff., NutraSweet Post Hearing Summaries § II), which was previously produced in the Antitrust Action, in which the president of Daesang, Dae Yeob Park, admitted in detail the manner in which Daesang and other large producers of aspartame conspired to coordinate their market behavior for the purpose of reducing competition, maintaining or increasing aspartame prices and protecting each other's pricing from encroachment by other producers, for at least ten years prior to entering into the transaction (Ex. H, annexed to the Sarkozi Aff.). NutraSweet also alleged that Daesang misrepresented its assets, operation, and the quality of its product to induce NutraSweet to enter into the transaction.
In support of its counterclaim for breach of contract, NutraSweet submitted evidence that Daesang failed to consistently and reliably produce aspartame that satisfied contractual specifications for production capacity, odor, microbial contamination, drying, diketopiperazine, and type IIA crystals, and also failed to remove foreign particle contamination, including metal shards, amongst others (NutraSweet's Terms of Reference, Ex, I; NutraSweet's Pre-hearing Memorandum, Ex. M, NutraSweet Post-Hearing Submissions, Ex. B, annexed to the Sarkozi Aff., at III and IV). NutraSweet submitted evidence to the Tribunal in the form of live testimony from five witnesses, eight witness statements, expert reports, and numerous exhibits in an effort to demonstrate that in 2003, 50% of the aspartame failed to meet contractual specifications, and in 2004, 29% of the aspartame Daesang sent failed to meet contractual [*4]specifications, causing NutraSweet to spend an additional $7,549,815 in capital expenditures, to resupply its customers with quality aspartame, and lost profits in the amount of $13,857,782.33 (NutraSweet's Post-Hearing Submissions, Ex. B, annexed to the Sarkozi Aff., at III and IV).
On December 21, 2012, the Tribunal issued a written partial award (the "Partial Award"). In the Partial Award, the Tribunal dismissed all of NutraSweet's counterclaims and defenses (Verified Petition, Ex. 3, App. A: Partial Award, ¶ 126). The Tribunal rejected NutraSweet's counterclaim and defense of contractual rescission on the ground that NutraSweet failed to establish the requirements for a rescission event under section 10 of the JDA, because the Antitrust Action had not been brought by a large customer of aspartame (Sarkozi Aff., Ex. A, (Id.; Partial Award, ¶ 86). 
The Tribunal determined that NutraSweet also failed to establish its defense and counterclaim of equitable rescission premised on fraudulent inducement on the ground that New York law does not permit such a claim to be based solely on express contractual representations (Id.; Partial Award, ¶ 104).
With respect to breach of contract, the Tribunal stated that NutraSweet has "not asserted any alleged breaches of the APA and Processing Agreement as a claim independent of its claims for rescission of these agreement," and alleged contractual breaches only in the context of their claims for fraud and rescission, which, according to the Tribunal, were otherwise not viable (Id.; Partial Award, ¶ 114). 
In dismissing all of NutraSweet's defenses and counterclaims, the Tribunal concluded that there was no bar to Daesang's right to recover the entire amounts owed under the APA and Processing Agreement (Id.; Partial Award, ¶¶ 121-22).
Thereafter, the parties filed several submissions to address the issue of damages, wherein NutraSweet asserted, amongst other arguments, that the Tribunal mistakenly failed to address its breach of contract counterclaim in the Partial Award.
On June 14, 2016, the Tribunal issued the Final Award, which incorporated the findings and determinations set forth in the Partial Award (Verified Petition, ¶ 17). In the Final Award, the Tribunal concluded that by the time of oral argument following the evidentiary hearing, NutraSweet had waived its breach of contract counterclaim."[FN1]
The Tribunal determined that NutraSweet [*5]breached the payment obligations of the APA and the Processing Agreement, and awarded damages to Daesang in the amount of $100,766,258, including interest calculated through June 10, 2016 (Verified Petition, Ex. 3, ¶ 196); Ex. 3A, Final Award, ¶¶ 113-121).
In September 2016, Daesang commenced the current petition to confirm the Final Award, and NutraSweet subsequently moved to vacate.
Discussion
NutraSweet moves to vacate the Awards on the grounds that the dismissal of its counterclaims and defenses was in manifest disregard of clearly established law and in violation of public policy.
An award may be vacated under federal law only if it violates a ground set forth in Section 10 of the Federal Arbitration Act ("FAA") (Allen & Co. v Shearson Loeb Rhoades, Inc., 111 AD2d 122, 123 [1st Dept 1985], 67 NY2d 709 [1985]). In addition to the grounds set forth in the FAA, a court may vacate an arbitration award "if it was rendered in manifest disregard of the law" (Schwartz v Merrill Lynch & Co., 665 F3d 444, 451 [2d Cir 2011]).
A court must determine whether "the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether," and whether the governing law ignored was "well defined, explicit, and clearly applicable to the case" (Matter of Roffler v Spear, Leeds & Kellogg, 13 AD3d 308, 310 [1st Dept 2004]). Merely an error or misunderstanding of the applicable law does not constitute manifest disregard (Id.). Judicial review of arbitration awards is extremely limited (Wien & Malkin LLP v Helmsley-Spear, Inc., 6 NY3d 471, 479-80 [2006]). An arbitration award must be upheld when the arbitrator "offer[s] even a barely colorable justification for the outcome reached" (Id.). 
NutraSweet argues that the Tribunal manifestly disregarded the law in the following manner: (1) it irrationally interpreted section 10 of the JDA to deny NutraSweet's right to contractual rescission; (2) it disregarded New York law that a party may bring a fraudulent inducement claim based on a misrepresentation contained in the contract; and (3) it failed to consider NutraSweet's counterclaim for breach of contract. NutraSweet also asserts that confirming the Awards would violate public policy by allowing Daesang to benefit from its admitted criminal antitrust violations and fraud.
I. Contractual Rescission
NutraSweet argues that the Tribunal's conclusion that the Antitrust Action did not trigger its right to rescind was plainly erroneous and in blatant disregard of the American Pipe Doctrine, wherein the Supreme Court held that the filing of a putative [*6]class action includes all asserted members of a proposed class, unless they receive notice and choose not to participate, until the issue of class certification is resolved (American Pipe & Const. Co. v Utah, 414 US 538, 551 [1974]). According to NutraSweet, the Antitrust Action, which alleged criminal antitrust violations against Daesang for the ten-year period prior to the JDA, was a collective action brought by and on behalf of all aspartame purchasers, even unnamed claimed class members, which triggered its right to rescind under Section 10 of the JDA. The Tribunal purportedly ignored this doctrine and undisputed evidence when it determined that the term "brought...by" must mean "that the person initiating the proceeding must be one of the entities specifically identified in Section 10," rather than concluding that the large purchasers of aspartame were part of a class action, as a matter of law, even if they did not all directly file the complaint (Sarkozi Aff., Final Award, Ex. A). 
Moreover, NutraSweet asserts that the Tribunal ignored established New York law and dispositive testimony in failing to consult a dictionary to determine the ordinary meaning of the phrase "brought...by" contained in section 10, and failed to credit the testimony of Daesang's chief negotiator that the parties understood that class actions were included in Section 10 as triggering events.
This Court finds that NutraSweet has not demonstrated that the Tribunal manifestly disregarded the law to the extent it concluded that the Antitrust Action did not constitute a rescissionary event under section 10 of the JDA. There is no indication that the Tribunal ignored or refused to apply governing law, or otherwise engaged in egregious impropriety (see Wien & Malkin LLP, 6 NY3d at 479-80). Interpretation of contractual terms is within the province of the arbitrator, and will not be overturned simply because this Court disagrees with that interpretation (see Yusuf Ahmed Alghanim & Sons v Toys "R" Us, Inc., 126 F3d 15, 25 [2d Cir 1997]).
Arguably, there is a colorable justification for the outcome reached, insofar as the Tribunal rejected the applicability of the American Pipe doctrine and interpreted a triggering event to be limited to the filing of a lawsuit brought by, and not on behalf of, a very large customer, and refused to consider the extrinsic testimony of Daesang's chief negotiator on the basis that the terms of the JDA were clear and unambiguous. Although this Court would have ruled otherwise, this ground does not warrant vacatur.
II. Equitable Rescission: Fraud in the Inducement
NutraSweet argues that the Tribunal manifestly disregarded the law when it concluded that NutraSweet's defense and counterclaim seeking equitable rescission based on fraudulent [*7]inducement does not give rise to an actionable fraud claim under New York law because it is based solely on the contractual representations set forth in the parties' agreements, and NutraSweet was merely seeking contract damages. The Court notes that there was no contract remedy because the Tribunal also dismissed NutraSweet's breach of contract claim arising out of Daesang's alleged multiple breaches of the APA and Processing Agreements, not on the merits, but based upon the conclusion that NutraSweet "chose to pursue a strategy of seeking only rescission," which "meant waiving any independent contract claim" (Final Award, ¶ 133). 
The Court determines that the Tribunal manifestly disregarded New York law in dismissing NutraSweet's claim for fraudulent inducement seeking the remedy of equitable rescission. Notwithstanding the presumption in favor of upholding arbitration awards, "deference to arbitrators is not without its limits" (Jock v Sterling Jewelers, Inc., 143 FSupp3d 127, 133 [SDNY 2015]). 
Here, the Tribunal chose to disregard the well-established principle that a fraud claim can be based on a breach of contractual warranties where the misrepresentations are of present facts (in contrast to future performance) and cause the actual losses claimed (see Wyle Inc. v ITT Corp., 130 AD3d 438 [1st Dept 2015]; GoSmile, Inc. v Levine, 81 AD3d 77 [1st Dept 2010], lv dismissed 17 NY3d 782; MBIA, Ins. Corp. v Credit Suisse Sec. [USA] LLC, 33 Misc 3d 1208[A] [Sup Ct, NY County 2011], reversed on other grounds 102 AD3d 488 [1st Dept 2013]). 
This legal principle clearly applies to NutraSweet's claim for fraudulent inducement seeking equitable rescission, and a review of the pre and post-hearing submissions demonstrate that NutraSweet repeatedly brought this governing legal principle to the attention of the Tribunal. Before the Tribunal was a sworn affidavit in which Daesang's president admitted to Daesang's participation in a decade-long criminal antitrust conspiracy with other major aspartame manufacturers right up until the transaction [FN2]
(Park Aff., Ex. H, annexed to the Sarkozi Aff.), which undermined the very basis of this bargain.
Nonetheless, the Tribunal ignored the applicable law, and [*8]mischaracterized NutraSweet's fraudulent inducement counterclaim and defense as one in which NutraSweet merely alleged that Daesang made an insincere promise of future performance. This conclusion is unsustainable. The fact that Daesang represented to NutraSweet in contract documents that it had "complied in all material respects with applicable laws ... in connection with the operation of the Business and the ownership and use of the Purchased Assets" (APA, § f), does not render NutraSweet's fraudulent inducement claim non-viable as redundant because NutraSweet demonstrated that Daesang misrepresented present facts which induced it to enter into the transaction. 
As articulated by the First Department, a "warranty is not a promise of performance, but a statement of present fact" (Wyle Inc., 130 AD3d at 441). Thus, by giving false representations about its criminal conduct pertaining to the operation of its business, Daesang was not making a promise of future performance- the breach of which would clearly constitute solely a breach of contract claim, but rather, misrepresenting a present, material fact designed to induce NutraSweet to enter into the transaction. The present intent to defraud at the outset of the transaction is what distinguishes NutraSweet's fraudulent inducement claim from a mere breach of contract claim. Thus, because rescission is clearly a viable remedy where one party demonstrates that it was fraudulently induced to enter into a contract (Gosmile, Inc., 81 AD3d at 82), the Tribunal's dismissal of the fraudulent inducement claim lacks even a "barely colorable justification" in black letter law (compare Wien & Malkin LLP, 6 NY3d at 480-81).
III. Breach of Contract
The Court reaches the same conclusion with respect to the Tribunal's failure to even consider the merits of NutraSweet's breach of contract counterclaim which was based on Daesang's breach of multiple provisions of the APA and Processing Agreement.
In addition to explicitly pleading a counterclaim for breach of contract in its terms of reference, NutraSweet submitted witness statements, live testimony, expert testimony, and cross-examined Daesang's witnesses, alleging $14 million in contract damages (Sarkozi Aff., Exs. B, I, M, N, O). After the Partial Award was issued and NutraSweet pointed out the Tribunal's error that it was, in fact, seeking recovery for breach of contract, the Tribunal concluded that NutraSweet had waived its breach of contract counterclaim during closing argument, and cited to the transcript of that hearing, held on October 20, 2011 (Partial Award, ¶¶ 114, 119). However, a careful reading of the transcript utterly fails to demonstrate that there was a waiver by Nutrasweet of its breach of contract counterclaim at the October 20, 2011 hearing. 
When asked by a member of the Tribunal whether NutraSweet [*9]was pursuing fraud or breach of contract claims, counsel for NutraSweet clearly and unequivocally stated, "We have both claims, we have a claim for fraud in Section III of the Post-Hearing Summaries and we have a claim for breach of contract in Section IV" (Tr 10/20/11 at 346). The portion of the transcript relied upon by the Tribunal was a dialogue concerning counter-claim III, rescission, not counter-claim IV, breach of contract. Thus, there was no basis to conclude that there was a waiver by NutraSweet. 
The refusal to consider the merits of NutraSweet's breach of contract counterclaim and the baseless determination of waiver goes beyond a mere error in law or facts, and amounts to an egregious dereliction of duty on the part of the Tribunal (see Wien & Malkin LLP, 6 NY3d at 480-81). Thus, the Court concludes that this portion of the Final Award must be vacated.
In light of the above determination, this Court will not address the argument that enforcing the Awards violates public policy.
Accordingly, it is
ORDERED that the NutraSweet Company, NutraSweet IP Holdings, Inc., and Sweeteners Holdings Korea LTD. motion, in sequence 01, to vacate the Partial Award and Final Award is granted, in part, and the matter is remanded back to the Tribunal for a redetermination of the counterclaims for fraudulent inducement seeking equitable rescission and breach of contract; and it is further 
ORDERED that the petition to confirm the Final Award is held in abeyance pending the Tribunal's redetermination.
DATED: May 15, 2017
ENTER:
_______________
J.S.C.



Footnotes

Footnote 1:The Tribunal stated: "by the time of oral argument following the evidentiary hearing Respondents [NutraSweet] chose to pursue a strategy of seeking rescission and only damages relating to rescission [...]. This meant waiving any independent breach of contract claim" (Final Award, ¶ 133). 

Footnote 2:In the affidavit, Park details discussions he had with the heads of "other major aspartame producers from 1992 until at least 2002 for the purpose of reducing competition, maintaining or increasing aspartame prices and protecting each other's customers from competitive pricing and encroachment by other producers," and even entered into an agreement with another major producer in order to refrain from competition and to "coordinate their prices" (Id. at ¶¶ 20, 29, 34).